KELLY, TIMANUS & CO., APPELLANTS, VS. ANDREW WALLACE, TRUSTEE, &C., APPELLEE.

1. The instruction of the Circuit Judge in this case was, that the principal, the person hiring a negro slave, was responsible for his loss through carelessness or misconduct of his agent; again, that if an agent hears that a negro cannot swim, and gives an order which no prudent man with this knowledge would give, he is responsible for the injury resulting from such improper act; held that this ruling was right.

2. From the evidence, it appeared that the negro, lost by drowning in the service of the defendants, was a green hand at the mill—afraid of water—was near drowning before, having been rescued by others, a fact known to the superintendent; that the employment he was put to was dangerous and requiring great expertness in getting logs out of a pen in the water of the depth of from two and a half to eight and ten feet deep.

Held, under these facts, that the order was illegal and improper, and defendants liable for the loss.

Appeal from the Circuit Court of Duval county.

This was an action on the case instituted to recover the value of a negro slave alledged to have been drowned in the service of the appellants through the negligence or improper conduct of their agent.

The appellants pleaded not guilty in the court below, and an issue being submitted on the plea, a verdict and judgment were rendered in favor of the appellee, who was the plaintiff below.

On the trial of the cause, the following testimony was offered to the jury by the parties respectively, viz:

For Plaintiff, Benjamin Kemble, being sworn, testified as follows :

Knows the Defendants, was in their employ in 1853, in Jacksonville, as agent and superintendent. While in their employment had in charge a negro man named Peter, who was hired of Doctor Murdock; he was a short, thick-set black boy about 26 or 30 years old. He was hired by the year at so much a month, thinks it was $15 per month— the negro was found dead in the water ; was drowned while he was at work at the mill—he was found drowned, supposed he was drowned at the mill—he was found at Finnegan's wharf; he was at work in the boom, when drowned, by order of witness. In the boom the deepest water is about 8 feet. Another boy named Major was sent outside by witness for a particular stick ; he told Peter to go for it, who did so ; it was then when he was drowned. Witness did not

send Peter for said stick but sent him into the boom; there were round and sided logs in the boom; the stick Peter went after outside was a very large sided stick. Has known Peter to fall into the river previous to that time, at least Peter said he fell in and has seen him in the water.— *The boy Peter said the dog saved him once from drowning;* (this was objected to by defendant's counsel, and objection reversed,) this was when he was in the employ of Kelley, Timanus & Co.; never knew him to fall into the river at any other times than those mentioned. The negro said he could not swim; (this was also objected to.) He was found on Sunday morning, and was drowned on Friday.

*Cross Examined.*—The negro went to put the logs in the boom. The water was only $2\frac{1}{2}$ feet but grew deeper as you went out into the stream. From the log to the opening of the boom the water was not over $2\frac{1}{2}$ feet deep. Witness was told that the boys were hired to work at the mill; no particular work was specified; sometimes we had one in the boom and then another, (this was objected to by plaintiff's counsel;) the risk of life is not greater on boom work than other work in the mill; (this was also objected to.) When we hird men at the mill, we generally put them at such work as we thought them best qualified to perform, and which was most profitable. Was not present when Major told Peter to go after the log; when the negro was missed Major then said he had sent him, Peter, and had not heard of him since; did not see Peter engaged in getting this log; witness says Peter was not exposed to any more danger than any other hands on the mill from order of any one; (this was also objected to by counsel for plaintiff.) This negro was only employed in the log pen at times: he was about the work, and was not in the pen more than other hands, and not as much as some; most always with some other hands;

he was good at hauling logs into the mill, that is fixing them for that purpose. The log Peter went after was about 40 feet long—it was a heavy log. No one ever saw Peter out side of the boom; no one knew what had become of him; they misssed him and thought perhaps he had run away as he was subject to run away; he run away from witness once and was gone a month; was a superintendant at the mill of "Kelly, Timanus, & Co. The log was on the shore when Major was sent for it; we afterwards found it at Finnegan's wharf; knew it was the same log.

Those parts of the direct examination which were objected to by defendants' counsel were then and there permitted by the Court to be read to the jury, whereupon the defendant's counsel then and there excepted.

The plaintiff's counsel then called William H. Dupray, who testified as follows :

Was in the employ of defendants in the year 1853 at their mill in this County; knew the boy Peter, who was hired there; has heard that he was hired of Doctor Murdock; he was an ordinary negro about 25 years of age; he was very good at the work he was put at.

The boy was drowned while witness was at the mill; can't say when he was drowned; has seen him employed in the log pen two or three times; witness saw him the day previous in the pen; saw him the morning he was drowned for the last time; out side of the boom the water is deep; don't know whether the boom was open the day the boy was drowned; there was a stick outside on the day before; the logs were hauled from the inside of the boom into the mill; does not know whether the boy could not swim; does not know that the defendants or Mr. Kemble knew he could not swim.

J. W. Moore was called by the plaintiff, and testified as follows to wit ·

Was in the employ of the defendants in 1853; knew Peter; has heard Mr. Kemble say he was hired from Doctor Murdock; he was about 25 years of age; he was a valuable negro; he was generally employed in the log pen; at the outer edge of the boom the water is 10 or 12 feet deep; inside, the water is shallow; the logs sometimes lie all over the pen, and often are lying against the outer edge, and have to be removed from there to get to the mill; it is dangerous employment for a person to go to the outer edge of the boom to get logs for the mill, particularly one that could not swim; thinks this was not proper employment to set one at that could not swim; thinks the boy could not swim, for witness saw him before off of a log and went to his rescue; thinks he would have been drowned then if he had not been helped; Mr. Kemble saw this and knew of it; this was the only boy of the name of Peter hired at the mill by Doctor Murdock; the bank goes out gradually into deep water; it is about 40 feet from the shore to the outside of the boom; when hands are sent for logs they are usually sent all over the boom for logs of particular size; does not know what the custom was in setting men at work; 40 or 50 yards from the slip to the boom.

John Chapman, called by plaintiff, testified as follows, to wit:

Was in the employment of defendants in 1853; knew the boy "Peter;" thinks that it was generally known that he could not swim; thinks Mr. Kemble knew it; Peter always acted as though he was afraid when he went near the deep water; has known Mr. Kemble to send him to the outer boom for logs; thinks it was understood by Mr. Kamble that the boy could not swim, because he picked him to go for logs, and was always kicking and cuffing him.

James M. Daniel, called for plaintiff:

Knew the boy "Peter;" has always understood he was the property of Doctor Murdock's wife, and belonged to Andrew Wallace, as trustee for her; knows of no other boy of the name belonging to them or in the possession of Dr. Murdock; he was in the employ of defendants, and general rumor says he was drowned; he was a valuable negro; knows of negroes that sold for $1,200; thinks he was drowned in 1853; Dr. Murdock bought some at that price not as good; could not say of his own knowledge what the value of that boy was.

Joseph Finnegan sworn for plaintiff:

Bought some negroes in the fall of 1853; thinks they were worth $1,000 in the spring and summer of those years.

Here plaintiff rested.

George K. Fairbanks sworn for defendants:

Has charge of a mill in this town; has been accustomed to hire negroes.

Counsel for defendants here proposed to ask the witness what was the general custom among mill men in hiring negroes; whether, when hired, generally, they were employed in any work about the mill the managers saw fit to put them at by such custom. This evidence was objected to by plaintiff's counsel, which objection was sustained by the court and the testimony rejected. Whereupon the defendant's counsel then and there excepted.

James H. McRoy, Jr., sworn:

Heard the testimony of Kemble read; remembers the sided log spoken of; saw it outside of the boom and requested Mr. Kemble to get it in; he said he would send Major after it; the next witness heard was that Peter was drowned; thinks good negroes were worth at that time from $800 to $1,000.

William H. Dupray sworn :

Says that the negro was a very ordinary negro, and did ordinary work about the mill; considered him an ordinary negro; he was not placed at sawing; don't think his services about the mill as valuable as others; he bore the name of runaway.

Here defendant's rested.

The court then charged the jury as follows :

" The plaintiff in this action brings this suit for the recovery of a negro named Peter, who, it is alleged, was hired to the defendants, and while in the employment of the defendants, owing to their negligence and want of ordinary care, was drowned and lost to the plaintiff. The hiring of a slave constitutes a bailment of the slave, and in such hiring, as in the hiring of any other personal property, the person hiring is bound to take ordinary care of him, and must answer for ordinary neglect. If, therefore, you find from the evidence that said negro was the property of the plaintiff, and was hired to the defendants, and while in their employment he was lost through the carelessness and misconduct of the defendants or their agent, then the plaintiff is entitled to recover. In all ordinary transactions (not criminal) a principal is liable for any act of his agent, when there is negligence, if done within the scope of his authority. If, therefore, you find from the evidence that an order was given to the said slave Peter by a person in the employ of the defendants, who had authority from them so to do, which no ordinary prudent man would have given, and that in consequence of said order the negro was lost, then the plaintiff is entitled to recover; but, if such order, in your opinion, was not an unusual one under the circumstances, and that there was not negligence in giving the order, then the plaintiff is not entitled to recover. If you find from the evidence that the

Kelly et al. vs. Wallace, Trustee, &c.—Argument of Counsel.

agent of the defendant knew that the said Peter could not swim, and he knowing this, gave an order to said Peter within his scope of authority as such agent, which order no prudent man with this knowledge would have given, then the knowledge of the fact that he could not swim by the said agent is sufficient. It was the duty of the defendants to employ careful and capable agents.

To all and every part of which charge the defendant's counsel then excepted.

*Philip Fraser* and *G. W. Call*, for Appellants.

The appellants, who are mill men, hired Peter of appellee by general contract for service at their mill. During the term an agent of the appellants sent the boy to the boom to run logs to the mill. While there he was sent by another negro outside the boom for a loose log, and in that service was drowned.

It was proven Peter said he could not swim. Testimony was offered and refused as to the custom of mill men.

We take the following points :

1st. The declarations of the boy that he could not swim were not admissible evidence.

2nd. The testimony of the custom of mill men should have been received.—17 Ala., 379; U. S. Digest, 1853, 75, § 45.

3d. The charge of the court was calculated to produce the impression that Peter was drowned in obeying an order of appellants, which, not being true, the charge was error.—14 Geo., 136.

4th. It was error to leave the question of negligence to the jury. It is a question of law for the court.

5th. It is not negligence to send one who cannot swim upon the water.

6th. Under a general contract of hiring the owners will

be presumed to have consented to the necessary risks.—2 Wheaton, 100 ; 2 Richardson, 458 ; 11 Iredell, 640 ; U. S. Digest, 1851, 59, § 11 ; 4 Porter, 239 ; 1 U. S. Digest, 374, § 138.

*McQueen McIntosh*, for Appellee.

The bailment of a slave was a contract technically known as " *locato rei*," (letting to hire,) and is well defined by Justice Story in his quotation from Pothier. Story on Bail, mar. p. 368.

And the use and enjoyment of the thing bailed does not contemplate its misuse and abuse, or its entire destruction.

The contract is one involving mutual and reciprocal obligation—both parties are mutually benefitted ; but as the owner, who has never parted with his proprietory interest, anticipates a return of his property, he reasonably expects that the bailee will confine himself to its reasonable use and enjoyment, and that he will preserve and protect it with reasonable care.—2 Kent Com., mar. p., 589, (5 ed.)

The *implied* obligation to protect the property is as much an element in the contract as the *express* engagement to pay the hire therefor, and this undertaking is *implied* by law.—Story Bail, mar. p., 373, citing Pothier in note ; Walker's Am. Law, 406, 408.

If, then, under a general hiring, the *implied* obligation to use the subject bailed with reasonable care constituted a part of the agreement, these defendants are liable to the plaintiff, not only for their own acts, but for the culpable negligence and mismanagement of those who act under their authority.—Wood's Inst., 237 ; Coop. Inst., 279 ; 1 Dom. Civ. L., 97, 98, § 1, 3, 4, 5, 6 ; 3 Petersd. Com. L., 257, citing Coggs vs. Bernard.

The bailee must not only use the property let to hire as the owner would, but he must exercise all the care consis-

tent with the value of the hiring and the nature of his contract.—Rice, 183, Coggs vs. Bernard. Cited in Smith's Lead. Cases, 17 Law Lib., mar. p. 91; Story Bail, 268.

The contract of hiring, as well as the use, may be implied, although there is no contract between the owner and the hirer; and it does not matter whether the loss of a slave by death occurred by reason of his want of skill or not.—King vs. Shanks, 12 B. Mun. Cited in 12 U. S. Dig., 74.

And whenever a slave is lost and it appears that he exposed himself, the presumption will be that he did not voluntarily expose himself, and that his loss was not occasioned by his own act.—Ivy vs. Wilson, Cheves Law Rep., 74.

The abuse of a lawful possession, or an appropriation of the subject hired to a purpose other than that contemplated by the owner thereof, is a conversion of it, and if used in a different manner or for a different purpose, or for a longer time than was agreed by the parties, the bailee is answerable for all damages and even for a loss which due care could not have prevented.—Duncan vs. R. R. Co., 2 Rich. So. Ca. Rep., 613, citing Strawbridge vs. Turner, 9 Law Rep., 613; Horner vs. Thwing, 3 Pick., 492; Mayor of Columbus vs. Howard, 6 Geo., 213; Lunsford vs. Baynham, 10 Hump., 242. Cited from 12 U. S. Dig., 74, § 24.

The law of bailments is the same, no matter by what lawful means the subject is in the hands of the possessor. Jones Bail., 48, citing, in note, Lord Raymond.

If in the trial of a civil issue the court see that justice has been done between the parties, they will not set aside the verdict nor enter into a discussion of the question of law.—Edmondson vs. Machell, 2 Durn. & East, 4; Smith vs. Page, 2 Salkeld, 644; Deetly vs. Msarine, ibid, 646;

Kelly et al. vs. Wallace, Trustee, &c,—Opinion of Court.

Cox vs. Kitchen, 1 Bos. & Pull., 338; Brazier vs. Clapp, 5 Mass., mar. p. 10; Remington vs. Congdon, 2 Pick, 310; Peters vs. Bamhill, 1 Hill S. C. Rep., 234; R. M. Charlton, 7; Peck vs. Land, 2 Geo., 16, 17; Ames vs. Baker, 411, 173; Stroud vs. Mays et al, 7 ibid, 269; Killen vs. Listrienk, 7 ibid, 283; Spears vs. Smith, 7 ibid, 436; Lang et al. vs. Hopkins, 10 ibid, 37; Arrington vs. Cherry, 10 ibid, 429.

Court did not err in permitting the negroe's statements to Kemble to be given to the jury.—1 Geo., 511.

BALTZELL, C. J., delivered the opinion of the Court.

This is a suit instituted to recover the value of a negro man slave, alleged to be drowned in the service of defendants, through the negligence or improper conduct of their agent.

One error complained of is in the charge to the jury given by the judge of the circuit. Its correctness can alone be ascertained by a full understanding of the testimony, which it is not proposed to give in detail, but rather a summary of its contents. Peter, the slave giving rise to this contest, was hired to work at a saw mill owned by defendants in Jacksonville, on the St. Johns river, for a year, at the rate of $15 a month. He was of the age of about 25 or 30, variously described by the witnesses as "ordinary, very ordinary, as an awkward green hand, and his services as not valuable; as valuable, very good at the work he was put at, good at hauling logs into the mill, that is, fixing them for that purpose." The nature of the employment in which he was engaged when drowned may be thus described: The pen or boom is an enclosure in the water near the mill, made to secure logs designed for sawing. "The water in it, for the most part, is 2½ feet deep, extending to 8 feet, whilst at the outer edge it is 11 or 12 feet." "The logs lie all over the boom,

often are lying at the outer edge, and have to be removed from there to be got to the mill when hands are sent for logs of a particular size. They are usually all over the boom." It is stated by one witness to be "a dangerous employment for a person to go to the outer edge to get logs, particularly for one that could not swim." The superintendent of the mill thinks the risk of life is considered no greater than other work at the mill, &c.; says Peter was not exposed to any more danger than any other hand in the mill. He states, that "the boy told him he could not swim; that he fell into the river on a prior occasion—at least, Peter said he'fell in; *he saw him in the water*, and Peter said a dog saved him once from drowning." Another witness thinks the boy could not swim. He saw him some time before fall from a log, and went to his rescue; thinks he would have drowned if he had not been helped; the superintendent saw this." A third witness "thinks it was generally understood at the mill that Peter could not swim; that he *acted as though he was afraid* when he went near deep water; has known superintendent to send him to the outer boom for logs." The occasion of his death is thus stated: "Peter was found dead in the water; was drowned while he was at work at the mill; was found at Finnegan's wharf; was employed at work in the boom by order of the superintendent when drowned; another boy, named Major, was sent outside by him for a particular stick; he told Peter to go for it, who did so; it was then when he was drowned; witness did not send Peter for said stick, but sent him into the boom; there were round and sided logs in the boom; the stick Peter went after outside was a very large sided stick; he was drowned on Friday and found on Sunday; was not present when Major told Peter to go for the log; when

Kelly et al. vs. Wallace, Trustee, &c.—Opinion of Court.

the negro was missed, Major then said he had sent Peter and had not heard of him since."

On this state of facts, the judge instructed the jury as follows : The hiring of a slave constitutes a bailment, and in such hiring, as in the hiring of any other personal property, the person hiring is bound to take ordinary care of him, and must answer for ordinary neglect. If, therefore, you find from the evidence that said negro was the property of plaintiff, and was hired to defendants, and, while in their employment, he was lost through the carelessness and misconduct of the defendants or their agent, then the plaintiff is entitled to recover. In all ordinary transactions (not criminal) a principal is liable for any act of his agent, when there is negligence, if done within the scope of his authority. If, therefore, you find from the evidence that an order was given to the said slave Peter by a person in the employ of the defendants who had authority from them so to do, which no ordinary prudent man would have given, and that in consequence of said order the negro was lost, then the plaintiff is entitled to recover; but if such order, in your opinion, was not an unusual one under the circumstances, and that there was not negligence in giving the order, then the plaintiff is not entitled to recover. If you find from the evidence that the agent of the defendants knew that the said Peter could not swim, and he knowing this and acting within his authority as such agent, gave an order to said Peter within his scope or authority as such agent, which order no prudent man with this knowledge would have given, then the knowledge of the fact that he could not swim by the said agent is sufficient. It was the duty of the defendants to have employed careful and competent agents."

It was objected to these that " they were calculated to produce the impression that Peter was drowned in obey-

ing an order of appellants, which, not being true, the charge was error. The boy Major gave the order, and not the agent of the appellants." The instructions are not liable, we think, to the objection. They are hypothetical, and leave the matter to the jury without any intimation of the opinion of the court. "If you find from the evidence that the agent gave an order to Peter," &c. This is the language of the instruction. It is not that Major gave the order to Peter—at least there is no evidence to that effect before us. The superintendent of the mill states this, but says, in another part of his examination, " that he was not present when Major told Peter to go after the log. *When the negro was missed, Major then said* he had sent Peter and had not heard of him since." Striking out the hearsay statement of Major, which is not testimony, and then removing the statement of this same witness that he, the agent, sent him into the boom, it will be remarked that the question before us is not whether such an order was absolutely given, but whether there was sufficient in the evidence to justify the court in referring the question of its existence to the jury, and we have no hesitation in saying that there was.

If there be error in this charge and those instructions, it consists, in our opinion, in applying the term negligence to what we cannot but regard otherwise than as an act of misfeasance; and if a positive wrong, an error however to the injury of plaintiff and not of the defendants, and of which the latter are not entitled to complain. The first instruction is nearly a copy of one given in the case of Forsyth and Simpson, which received the approbation of this court, and will be more fully noticed hereafter.

It is very obvious that the merits and strength of the case lie in the last instruction. It is the act of the agent of the defendants in causing the negro to go into the boom,

Kelly et al. vs. Wallace, Trustee, &c.—Opinion of Court.

or outside of it, in quest of a log, knowing that he could not swim, that creates the responsibility, and to this the attention of the court will be addressed.

A person hiring a slave is but the assignee of the master, and by the act of hiring acquires for the time his rights to the labor and services of the slave, has the power and dominion over him which the master has, has the responsibility, too, of a master, with the additional obligation that in case of abuse or injury to the slave by improper conduct on his part, he will make compensation for the damage.

Now, what is the extent of this power and authority of the master? Is it absolute, unlimited, uncontrolled? By no means. The slave is subject to his master to the extent of his capacity and power, mental as well as physical, and his duty is to obey his orders to the extent of his ability. Hence, then, results a duty on the part of the hirer to inform himself of this capacity, so as not to engage him, the slave, in a service or labor for which he is unfitted or incapacitated by his mental or physical organization. There is a duty, too, on the part of the owner to be frank and explicit in effecting a hire. Good faith, honesty, the true interests of the master and the slave and the person hiring require, that there be a clear and full understanding on this subject. It is said that a slave hired to work at a mill is subject to any work to be performed there. We think not. A hand used to the saw may be in peril if put at the engine or on slippery logs in the water. The engineer, though fearless in his position, may be in imminent danger from the saw or getting logs in the water. A hand not skilled should not be put at any of these, especially if in addition there is a physical infirmity to prevent an execution of the duty. Take the case of a green hand, unused to a steam saw mill. May he at once be put

Kelly et al. vs. Wallace, Trustee, &c.—Opinion of Court.

to the saw or about parts of the machinery most liable to produce injury to inexperienced persons, and when, in addition, it is ascertained that from alarm and fright he loses his self-possession and is incapable of his own preserva-tion? Such work, most obviously, is beyond his reach and capacity. He should not be subjected to it. The exer-tion of such power is not the exercise of authority, but the abuse of it—an act of cruelty and oppression having no sanction of law or morality. A master could not rightly punish for disobedience to such an order, and, if he did so, might be liable to the criminal law, which provides " that no cruel or unusual punishment shall be inflicted upon a slave by any master, employer or owner."—Thompson's Digest, 511.

With this view of the principle, it remains to apply it to the case before us. Ability to render service on the water, for the most part, is acquired, and is the effect of early prac-tice and training. It takes time and use for those unac-quainted with the element to accommodate themselves to their new position. With some, there is a natural infir-mity, often not to be overcome, that disables from service on or near it. They at once loose their faculties and self-possession, and are scarcely intelligent beings. Should there have been a narrow escape from drowning, it but adds to the embarrassment and difficulty.

To say or even suppose that a master would force such a slave into such a service is wholly to misunderstand and misrepresent him. It is alike a mistake that he would or could communicate such authority in hiring him.

In the present case, we have seen that Peter was afraid in going near deep water; that he told the agent he could not swim, and it was generally understood he could not. He was seen to fall in and was rescued from drowning by the help of another. He said he had been saved from

Kelly et al. vs. Wallace, Trustee, &c.—Opinion of Court.

drowning by a dog prior to this. More than this, the employment itself was of an unusually perilous character, requiring a resolute and stout head and heart and active and expert limbs, and experience and acquaintance with the subject.

Under such a state of facts, there can be no hesitancy on the part of this court in agreeing with the court below and jury in regarding the act of this agent as wholly unwarrantable and illegal and in holding his principals responsible.

On the trial, the superintendent said, "The boy Peter told him the dog saved him once from drowning, and the negro said he could not swim." This was objected to by defendants as not being legal testimony, and the court below admitting it, this is presented as ground of error. It is very obvious the only effect of these expressions was to show that the superintendent was aware of this inability of the boy. We think the point not at all material, as there is abundant other testimony in the case establishing the fact of knowledge, so that the exclusion of this could have had no effect whatever if the ruling were erroneous. The statement is not mere hearsay from the negro—it is the admission of the party himself charged with the conduct of this slave that he had information as to his ability. It may have been imperfect, still it was knowledge, and we think was admissible. We shall not, however, for the reason just stated, enter into any argument to show that it was entirely unexceptionable.

The next exception is to the refusal of the court below to admit the testimony of George R. Fairbanks. It was proposed to ask him the general custom among mill-men in hiring negroes; whether, when hired generally, they were employed in any work about the mill the managers can find to put them at. This is upon the supposition

Kelly et al. vs. Wallace, Trustee, &c.—Opinion of Court.

that the rights of the parties in these contracts are not understood or defined by law, and that it was necessary to resort to witnesses to ascertain them. Admitting this to be the case, it would scarcely comport with right or justice to appeal to one of the parties to a contract, or to any number of parties, when there are numerous contracts of a like character to give the rule of construction so as to fix and ascertain their own rights and responsibilities and those of the other contracting parties.

A custom or mode of dealing between persons engaged in a particular pursuit sometimes reaches to the estimation of an implied bargain. It does not extend to others not parties to the custom nor participant in it. If the question had been proposed to owners, or persons hiring, as to their consideration and custom of treating the subject, there would be greater plausibility in it. We think there is no difficulty in the application of the law to the case and in ascertaining the rights of the parties, and therefore think the evidence was rightly rejected.

From the view already taken of the subject, it will be evident that we are not inclined to favor the motion for a new trial.

Whilst such is our conclusion as to the law of the case, it is yet a part of our duty to see that it has the support and sanction of other courts, and especially of those of our sister States familiar with this peculiar species of property and the relations incident to it. Unfortunately, we have not access to books, and particularly those bearing most directly on the points, and are confined, in some degree, to digests. Those in our power have received very careful and attentive consideration. A case of this kind was before the Supreme Court of this State in 1853, reported in 5th vol. Florida Rep., p. 337—Forsyth vs. Simpson. In this the instruction of the Circuit Court was almost iden-

tical with those given here, excepting that as to swimming, and this court sustained the ruling. The facts, as stated in the opinion, were that the slave was ordered to jump on board a steamer from a flat boat lying along side. In the attempt to do so he struck the guards of the steamer, fell into the water and was drowned. The court say, "the contract for hiring constitutes a bailment of the property, and, it being mutually beneficial to both parties, something more than good faith is required. The owners of the boat were bound to take ordinary care of the slave, and, failing to do so through their agents, they are responsible for the consequences. Apart from other views, considerations of public policy, the interests of the master and humanity to the slave require that he should be shielded from the unrestricted control and oppression of irresponsible subordinates. Public policy emphatically demands that the owners of boats and railroads, and other public conveyances, should employ careful and capable agents in their respective business." It is to be regretted that the facts and circumstances connected with the order to the slave, and which would principally give it character, are not stated in the opinion nor the report. It is only stated that the jury found gross negligence, yet, without these, it is difficult to conclude that in the mere giving of such an order there was gross negligence. The force of the decision on this account is somewhat diminished.

In the case of Ives vs. Wilson, decided by the Court of Appeals of South Carolina, which was for the loss of a negro occasioned by a mortal injury produced by the collision of two steamers, the jury were instructed, that "to make the defendant liable the collision must have resulted from his intention, his want of skill or negligence in navigating his vessel." The court say the jury had evidence upon which they might conclude the defendant was guilty

of negligence; if so, the verdict is right."—Cheves' Law Rep., 75.

The Supreme Court of Tennessee hold language of this kind: "The law exacts from the hirer of a slave an observance of humanity and that measure of care and attention to his comfort and welfare that a master with a humane sense of his duty would feel it incumbent on him to exercise in the treatment of his own slaves.—10 Hump., 267.

In Georgia, language is used to the same effect: "He ought to use the thing and take the same care in the preservation of it which a good and prudent father of a family would take of his own. Hence, the hirer being responsible only for that degree of diligence which the generality of mankind use in keeping their own goods of the same kind, it is very clear he can be liable only for such injuries as are shown to arise from an omission of that diligence; in other words, for ordinary negligence."—6 Georgia.

In Alabama, it is held, that " the hirer is liable only for gross negligence, which is defined to be the want of slight diligence or a failure in the commonest degree of prudence, or an omission to exercise the diligence which men, habitually careless or of little prudence generally, take in their own concerns."—Ware vs. Taylor, 4 Port., 239.

In North Carolina, it was held that the hirer of a slave was bound to use such diligence and prudence as a man of ordinary prudence, could if the property were his own; that as a slave was a being, so much care was not necessary as would be required of the bailee of a brute or inanimate thing; that, as F had hired the slave for this very purpose, he would be presumed to know all the dangers and risks, and therefore plaintiff could not recover.—11 Ire., 640; U. S. Dig., 1851, p. 59.

This was the case of a boy 12 years old, hired to drive a

24

horse near the shaft of a gold mine. The boy whilst working at night, being without an overcoat, had gone to the fire to warm himself, and on his being called to start the horse, being drowsy, fell into the mine and was killed.

In the case of McDaniel vs. Ewing, decided by the Court of Appeals of S. Carolina, a negro man, Jack, was hired as one of the crew of a steamboat and was lost, being knocked overboard, he and the captain being excited by spirits at the time. The court decided that the hirer was liable, inasmuch as Jack was detained after his time had expired. In another aspect of the case, if Jack was not discharged, that " the company could not be liable for the loss of Jack, unless it resulted from some wilful misconduct of the captain, or such as should be regarded in the light of carelessness or negligence." They say further, the captain had a right to order the boat to be turned back, and Jack was bound to obey the order, and whether the manœuvre was conducted with skill or not on the part of the captain, could make no difference, as the negro was bound to run all the hazards of employment from orders given in good faith and by an officer competent at the time the company employed him. 2 Rich., 457.

These two latter decisions by no means impugn the force of the views we have taken. They decide, that when a boy is hired for a special purpose—for instance, as one of a boat's crew—he undertakes the hazards of the employment; so does an engineer of a steamboat, or a hand at the saw. If either of them, without any order or misconduct of his superior, gets entangled in the machinery so as to lose his life, the loss may not fall on the person hiring. The other cases most evidently show the propriety of the present finding and the appropriate ruling of the court below. We see no reason, on a view of the whole case, to disturb the judgment of the court below, and it is therefore affirmed with costs.