THE PENSACOLA AND GEORGIA RAILROAD COMPANY, APPELLANT, vs. MILES NASH, APPELLEE.

1. Where two juries have concurred in finding a verdict, it ought not to be set aside as against the weight of evidence ; otherwise, when it is clearly against evidence.

2. Where the evidence is contradictory, making it the duty of the jury to decide upon the credibility of the witnesses, the court will not set aside a verdict as against the weight of evidence.

3. Where a jury on a second trial find a verdict against the decision of the court on a former motion for a new trial upon a point of law, the court will grant a new trial.

4. If a verdict be found upon testimony which did not tend to prove a material fact necessary to entitle a party to recover, or upon a misapplicacation of the facts to the charge of the court, a new trial will be ordered, though the same verdict may have been found by two juries upon the same state of facts.

5. Where a slave was injured in the act of performing an improper order, or one not warranted by the contract under which he was hired, the hirer is liable for all the consequences of the injury.

6. But the injury must have been the immediate consequence of the improper employment; or have been received while so improperly employed ; or have grown out of the peculiar hazard of the employment; and if an injury occur subsequently on account of the carelessness or heedlessness of the slave, and without the fault of the hirer, the hirer will not be liable for the consequences of the injury.

This is an appeal from the Circuit Court of the Middle Judicial Circuit in Leon county.

The opinion of the court contains a full statement of the facts to which reference is made.

*M. D. Pappy*, for Appellant.

This was an action of Case and Trover by Nash, plaintiff, below, vs. The Pensacola and Georgia Railroad Company, for the recovery of the value of a slave alleged to have been killed by the careless act of the defendant and its servants.

Pleas.   Not guilty, and that the injury resulting in the death of the slave was the consequence of the carelessness of the slave and not of defendant.

The facts presented by the record are to be found in the statement thereof presented by the counsel for the appellee.

We maintain for the appellant, that if the order which it is said was improper was of a character not authorized by the terms of the contract of hiring, yet that to enable the plaintiff to recover, the slave must have been injured whilst executing the alleged improper order, and that as such was not the case here, the verdict should have been for the defendant.

It appears by the testimony that the slave was injured, not in the execution of the order, but by his own wilful attempt to get on the engine while in motion, without any order to that effect, and without any necessity, the engine being in the yard where it was to be laid up.

The case of Kelly and Timanus vs. Wallace, 6 Flor., 690, shows that it was whilst the slave was engaged in executing the improper or dangerous order that he was lost, which gave the right of recovery.

So, too, in Forsyth and Simpson vs. Perry, 5 Flor., 337.

The company are not liable for injuries to persons, &c., through the recklessness and want of common care and prudence of such person; as where a slave lay down on a track and was run over by the cars, it not being able to discover him above twenty feet, &c.   Redfield on Railways, 384–5, note.

2. We say that the order itself was not improper, because there was no danger in executing it, and was not an order to couple cars, which was what was provided against by the contract of hiring.   The testimony of Vinson proves this.

*A. J. Peeler,* for Appellee.

This case has been pending for more than eight years.   It has been thrice argued and submitted to a jury.   Once there was a mistrial, and twice a verdict was rendered for the appellee.

The appellant has had the advantage of *one new trial* in the court below, by which the plaintiff was denied the benefit of his judgment, and delayed in the progress of his case nearly two years, and because a second verdict against it has not been set aside and a *second new trial* granted, it now comes to this court and asks that the *concurring verdicts of two juries* against it upon the facts shall be treated as naught, and the circuit court be required to permit it for the *fourth time* to go before the country.

If this court, adopting its language in the case of Sanderson & Co. vs. Hagan *et al.*, 7 Fla., 318, "*will very reluctantly interfere with the verdict of a jury as to the facts,*" it will certainly find little in a case so extraordinary as this to invite or justify its interference.

Formerly this court and its predecessor, the Court of Appeals, refused to invade the province of facts, and the discretion of the judge below. Carter vs. Bennett, 4 Fla., 356.

But under the act of 1853, the refusal of the judge below to grant a new trial may now be assigned as error, &c. Pamp. Laws, 100.

From the reported cases since the passage of this act, the court seems to have discharged their duty under it with great wisdom and caution, owing no doubt to its innovation upon "the practice sanctioned by the most venerable authorities; and to its extremely delicate nature; and to the fact that the slightest mis-step in that direction would result in the utter breaking down of the frame-work of our judicial system," and the conversion of the three justices of the Supreme Court into *three petit jurors.*

"Where there is conflicting evidence, and the verdict is not manifestly against the evidence, the court will not interfere to set aside the verdict of a jury." Talla. R. R. Co. vs. Macon, 8 Fla., 299.

"Nor will a new trial be granted in case of conflicting testimony when the weight of the evidence agrees with the verdict." Hancock, administrator, vs. Tucker, administrator, 8 Fla., 435.

With reference to the law thus laid down and the facts apparent upon the record, I propose to examine the several errors assigned by the appellant.

The first error assigned is, "That *the verdict of the jury was contrary to the evidence.*"

The record discloses that the slave, Jackson, was the property of Miles Nash, plaintiff, in the court below; that said slave was hired by the said Miles Nash to the Pensacola and Georgia Railroad Company; that while in the employment of said company the foot of the said slave, Jackson, was crushed by one of its engines, which at the time of the accident was being moved by its direction and control; that said slave died from the effect of said injury; that his value at the time was between $1700 and $1800.

These facts being established, and they were not disputed in the court below, it remains only to inquire under the issues raised by the pleadings,

1st. Whether the death of the slave, Jackson, was occasioned by the carelessness, negligence, or improper conduct of the Pensacola and Georgia Railroad Company?

2d. Whether the slave, Jackson, was killed while in the performance of a duty ordered by the company outside of his regular employment, a duty which he was not required to perform by the contract of hire?

Upon the first issue, the witness, John S. Key, who was the engineer of the company and had charge of the locomotive at the time of the accident, states, in his answer to the fifth direct interrogatory, that the slave, Jackson, "got out to attach a rope to the train and engine, and getting back fell, and the wheels of the engine ran over his foot;" and in his answer to the sixth direct interrogatory, he says that he "ordered him off for this purpose." To the seventh cross interrogatory, which is in these words: "Have you or not frequently known firemen to get on the locomotive when it was in motion, and would you or not consider it dangerous to do so when the car was moving as slow as your's was when Jackson attempted to get up?" he answers,

"They often get off and on when the cars are moving. *I do not consider it safe at any time when the cars are in motion.*" In his answer to the third cross interrogatory, he says: "I saw him (Jackson) put his hand on the handle of the car to get up ; his hand slipped, and he fell, and I immediately reversed the engine and stopped." In his answer to the fifth cross interrogatory, he says, "That it was not necessary for Jackson to get back upon the locomotive until it stopped." Now if this witness, who was the employee of the railroad, and dependent upon it for his situation, and whose interest it was to testify in favor of the railroad so as to relieve himself of all blame in the matter, "did not," to use his own language, "*consider it safe at any time when the cars are in motion*" to get off and on, why did he *order Jackson off*, and if it was "*not necessary* for Jackson to get back upon the locomotive until it stopped," and it was *not safe for him to do so*, why did he not order him *not to get back?* for he knew that Jackson was required to return to the engine, as a fireman, and that the getting out to attach the rope and the return to his place on the engine was but the execution of one order, and he could easily have prevented accident, for he admits that he "*saw him put his hand on the handle of the car to* get up." Was there not here something more than "carelessness, negligence, or improper conduct" on the part of the Pensacola and Georgia Railroad Company? Was there not in addition to their *legal* liability, which is clearly established, a *moral* liability for wickedly and cruelly thrusting a poor slave, a faithful and confiding creature, over whose will and action they held complete dominion, into the jaws of a terrible death?

The Supreme Court of this State, in an action of trespass brought to recover the value of a negro slave who was drowned in an attempt to execute an order of the mate of a steamboat, held, "That in all relations and in all matters, except as to crime, a slave is regarded by law as property, and therefore the rule that the principal is not liable to one agent or employee for damages occasioned by the negligence or misconduct of another agent or

employee, is not applicable to slaves;" and that "the contract of hiring of a slave between the owner and the hirer constitutes a bailment of the slave, and the hirer is bound to take ordinary care of him." Forsyth and Simpson vs. Perry, 5 Fla., 337.

The facts of this case were simply, "That the slave was ordered to jump on board the steamer from a flat-boat lying along side. In the attempt to do so, he struck the guards of the steamer, fell into the water, and was drowned." The court, in commenting upon the character of the bailment, say "that something more than mere good faith on the part of the bailee, is required;" and further, the fact of the slave being a human being, while it does not impair the right of the owner, would rather increase than diminish the liability of the employer; and in conclusion they add: "Apart from the views presented, considerations of public policy, the interest of the master, and humanity to the slave, require that he should be excluded from the exception to the rule, and that he should be shielded from the unrestricted control and oppression of irresponsible subordinates. The liability of the employer (similiter) for the misconduct of his subordinates, will naturally add to the personal security and protection of the slave. Public policy emphatically demands that the owners of boats, railroads, and other public conveyances should employ careful and capable agents in their respective business."

In the case of Kelly et al. vs. Wallace, Trustee, 6 Fla., 690, which was also an action on the case to recover the value of a slave lost through the improper conduct of appellant, the court comment on and affirm the doctrine as laid down in Forsyth vs. Simpson.

The same question again came before the court in the case of Tallahassee Railroad Company vs. Macon, 8 Fla., 299, which was also an action on the case to recover the value of a slave who, it is alleged, died from the neglect and want of care on the part of the appellant, and the court lay down the doctrine, "that the bailee of a slave upon hire is bound to bestow that degree of care and attention which a humane master would be-

stow upon his own servant under the like circumstances." And all these cases were carried to the Supreme Court by appeal from refusals to grant new trials, and in each of them the judgment of the court below was affirmed with costs. As will be seen by reference to these opinions, they are well fortified by authorities from our sister States, having at the time the same institutions as ourselves.

2d Issue. Was the slave Jackson killed while in the performance of a duty ordered by the company, outside of his regular employment—a duty which he was not required to perform by the contract of hire? It is not denied that the slave Jackson was killed in the employment of the company—the questions are, 1st. Was he killed while in the performance of a duty ordered by the company? 2d. Was this duty outside of his regular employment—a duty which he was not required to perform by the contract of hire?

Upon the 1st question, the witness, John S. Key, who was the engineer, and agent and employee of the company, and had charge of the engine at the time, *admits*, in his answers to the 5th, 6th, and 8th direct interrogations, *that he ordered Jackson off to attach a rope to the train and engine; that " after he had fastened the rope to pull the train down, when the train got far enough he loosed the rope and said 'All right, come back,' and then stepped to the engine and fell, and the wheels passed over his foot."* This certainly shows that the slave Jackson was in the performance of a duty ordered by the company when he received the injury. The engineer was nearer to him than any one else, and says, in answer to the third cross interrogatory, that he saw him "when he put his hand on the handle of the car to get up."

The witness, Vinson, also states that *" the boy, Jackson, the fireman and a train hand, then attached a rope from one corner of the car and tender, and drew the train up two cars. The engine, after this was done, started."* It is contended that Jackson, in getting back on the engine, was not in the performance

of a duty, &c., and that being injured in getting back, that the company is not liable, &c. Such a flimsy attempt to evade the consequences of the order given by the company will scarcely be countenanced by the court. The getting off the engine, attaching the rope, drawing up the cars, and getting back on the engine, were all necessary duties embraced in the order. Jackson's duty was upon the engine; he was under the control and direction of the engineer; when the engine started it was his place to be there; it was natural that he should seek to get back. The engineer saw him attempting to get back; if it was not his duty to return, why did he not order him *not* to get-up? and besides, had he not ordered him off, there would have been no necessity for his return, and the accident would not have occurred. Jackson being a slave, a passive instrument in the hands of the engineer, could not have refused to incur the peril of a return to the engine. 8 Fla., 305, 306.

2d Question. Was the duty being performed by Jackson at the time, a duty outside of his regular employment—a duty which he was not required to perform by the contract of hire? As will be seen by reference to the testimony of John H. Bowman and Miles H. Nash, the contract of hire was made between said Bowman, at that time superintendent of Pensacola and Georgia Railroad and authorized as its agent to employ hands, and Miles H. Nash, representing Miles Nash, the plaintiff. Bowman, in his answer to the sixth direct interrogatory, says: "The agreement was that he should be employed as fireman, to fire up the engine, to keep it clean, take in wood and water when on the road, and when not employed on the road, to assist in working on the engine in the shop. He was not hired for the purpose of coupling and uncoupling cars, or *drawing up trains to be attached to the engine.* He was not hired for any other purpose than that of a fireman." The same witness, in answer to the seventh direct interrogatory, to wit: "Is the work of drawing up a train or separate cars, and attaching the same to the tender, and getting off or on the car or engine for the pur-

pose of attaching them together by a rope or otherwise, and cutting them loose, and signalling when to start or stop, the kind of work in which it was agreed the slave Jackson should be employed by defendant?" says: "*It was not the work the slave Jackson was hired to perform, but was entirely foreign to that for which he was employed.*"

This is the testimony of the company's own agent and superintendent, who made the special contracts of hire for it, and it is fully corroborated by the testimony of Miles H. Nash, who entered into the agreement for the plaintiff. It further appears from the testimony of both these witnesses, that there was objection made by the plaintiff, on account of the wish of Jackson, to Jackson's being hired to perform the very duty in the performance of which he lost his life, and that the plaintiff, to accommodate Jackson in the matter, stipulated that he should not be required to perform such duties on account of their danger, &c. Can anything more be required on this point? It is clearly proven that there was a special contract of hire, and that the slave Jackson was ordered by the company to perform a duty outside and in flagrant violation and disregard of its terms, and that while in the performance of such a duty, he received an injury of which he died. Miles Nash was, therefore, entitled to recover his value in trover. 8 Fla., 305, 306. The authorities there cited by the court to support this doctrine are Harrison vs. Buckley, 1 Strobart, 525; Duncan vs. R. R., 2 Richardson, 616; Bell vs. Cummings, 3 Sneed, 275; Lumsford vs. Baylman, 10 Humph., 267; Latimer vs. Alexander, 14 Geo., 259; Mitchell vs. Mims, 8 Texas, 6; Goatman vs. Hurt, 6 Humph., 375; *vide* also Spencer vs. Pilcher, 8 Leigh; Heesely vs. Branch, 1 Humph., 199; 1 Geo., 195; and 11 Iredell, 16, 640.

2d assignment of error. "Because the verdict is contrary to the weight of evidence." I do not propose to discuss this. Instead of being against the weight of evidence, it is fully sustained by the evidence, and it is not surprising that *two intelligent juries in Leon county were compelled under their oaths* to

find a verdict upon it for the plaintiff. But even if "the evidence was conflicting, and the verdict not manifestly against the evidence, the court will not interfere to set aside the verdict of a jury." 8 Fla., 299, 435.

3d assignment of error. "Because the verdict of the jury was contrary to law." The law applicable to the case was very clearly given by the court below in instructions asked for by both plaintiff and defendant, and no exceptions were taken to them by either side. There was no room for the jury to have mistaken the law, and it was for them to say whether under the law as they received it from the court, there was evidence to support a finding for the plaintiff, and two juries have so declared. To disregard and set aside their verdict, unless it is very plain that it was without evidence, or that they mistook the law, is to take from them their office as the "legitimate tryers of facts." The maxim, *ad questionem facti non respondent judices, ad questionem legis non respondent juratores,* is as wise as it is venerable, and rests upon the frame-work of our judicial system. The legislature of this State has regarded with such sacredness the exclusive right of the jury thus defined, that it has prohibited the courts from charging them as to the facts in any case.

4th assignment of error. "The verdict of the jury was contrary to the instructions of the court." Before the passage of the act of January 3d, 1848, the judge might in some cases have instructed the jury as to the facts; but being under that act prohibited from charging the jury upon "the facts of the case," I am at a loss to discover how the finding of a jury upon the facts, upon which they alone were competent to pass, can be contrary to the instructions of the court. If their verdict was contrary to the instructions of the court, it was contrary to law, and was therefore comprehended in the fourth assignment.

Where two juries have concurred in a verdict, it must be a very strong and flagrant case to justify the court in granting a

new trial. Swinnerton vs. Marquis of Stafford, 3 Taunt., 231; Barrett vs. Rogers, 7 Mass., 297; Frost vs. Brown, 2 Bay., 133; Perry vs. Briggs, 2 Nott & McCord, 184; Bennett vs. Runyon, 4 Dana, 422; Duggan vs. Cole, 2 Tex., 381.

WESTCOTT, J., having been of counsel, did not sit in this case.

RANDALL, C. J., delivered the opinion of the court:

This was an action commenced in Leon Circuit Court in 1860. The declaration contained three counts. The first count alleges that the plaintiff was possessed of a valuable slave named Jackson, of the value of $2000, and that Jackson was employed on the trains of the railroad of defendant, and that the agents and servants of the defendant so carelessly and improperly drove and managed the train and locomotive of defendant, that through the carelessness, negligence, and improper conduct of defendant, by its servant, the train was run over the slave, and crushed and broke his leg, from which injury he died.

The second count was in trover.

The third count alleges that plaintiff hired to the defendant the slave Jackson to be employed by defendant as a fireman upon a locomotive engine; that defendant disregarding his contract employed said Jackson in and about other business than that mentioned in the contract, and while so employed the slave was run over, crushed and injured through and from the carelessness, negligence, and misconduct of defendant through his servants, by reason of which injuries the slave died, to the plaintiff's damage, &c.

The defendant pleaded not guilty, and further, that the injury from which the slave died resulted from the carelessness of the slave and not of the defendant.

The plaintiff proved by John Bowman that he was in the employment of the railroad company and acted as their agent in the hiring of hands. The slave Jackson was hired by him for

the company, of Miles Nash, in January, for the balance of the year 1860, for two hundred dollars. The agreement was that he should be employed as a fireman, to fire up the engine, keep it clean, take in wood and water when on the road, to assist in working on the engines in the shop. Was not hired for the purpose of coupling and uncoupling cars, or drawing up trains to be attached to the engine, or for any other purpose than that of a fireman. The work of drawing up a train or separate cars and attaching them to the tender, or getting on and off the engine for the purpose of attaching them together by rope or otherwise, and cutting them loose, and signalling the engineer when to start or stop, was not the work Jackson was hired to perform, but was entirely foreign to that for which he was employed. There was objection made by plaintiff to the slave being employed in any work which would require him to get off and on the engine to couple and uncouple cars, or in any work except that of fireman, on the ground that he considered it dangerous to couple and uncouple cars, and he did not wish to have him changed from one kind of work to another. It was Jackson's duty to attend to the brake on the tender. There was a man employed on the railroad for the purpose of coupling and uncoupling cars at the time Jackson was employed. Was not present when he received the injury of which he died. The duties of a fireman are to attend to the firing up the engine, keeping it clean, taking in wood and water, and attend to the brake on the tender. I assured the plaintiff that Jackson should be employed in no other capacity than that of fireman, and the contract with the plaintiff was subject to such assurances. I was first employed by this railroad in December, 1857, as engineer. Left the employ of the company in February, 1860. There were train hands for the purpose of handling freights, switching cars, and work of that kind. The fireman sometimes assisted, but not as a general thing. I have prohibited them doing such work. I have ordered the fireman to shut the cylinder cocks while the engine was going slowly,

They frequently shut them on the ground, and got up after the engine started, which I regard as part of their duty. Plaintiff asked more wages for Jackson, in consequence of the risk he would run as fireman, than he asked for him to work in the country. Jackson was in the employ of the railroad company when I went there in 1857, as a fireman. It was understood between the plaintiff and myself that Jackson was to perform all the duties of a fireman on the Pensacola and Gulf Railroad.

Miles H. Nash, for plaintiff, testified that the boy Jackson died from lockjaw, the effect of the injury received on the road. The foot was amputated by surgeons. The boy had been hired to the road before. He had objected to the manner in which he had been employed, first at one thing, then at another. We hired him as a fireman, and fully discussed the duties of a fireman. The strict duties of a fireman were to be performed, He was not to attend to the coupling and uncoupling of cars, or shifting cars or like work. Was hired to perform the duties of a fireman as understood between Bowman and myself. Was offered the same wages in the country for him to perform duty as a fireman on an engine. Don't think I could have got as much on a plantation.

On the part of the plaintiff, John S. Key testified : The man Jackson was injured in my presence. He got off to attach a rope to the train and engine, and getting back fell, and the wheel ran over his foot. Was ordered off the engine by witness to attach the rope. The train had just come in from St. Marks. After he had fastened the rope to pull the train down, when the train got far enough he loosed the rope and said, "All right, come back," then stepped to the engine and fell, and the wheel passed over his foot. The engine was barely moving and had not made more than three revolutions. The duties of a fireman are to obey the orders of the engineer in firing the engine, getting in wood and water, cleaning up the engine, coupling and uncoupling the engine, attaching cars, and any other work he may be called on to do by the engineer while

on the road, and when in the shop to do any work he may be called on to do by the master mechanic. I think the injury was his own carelessness, and not the carelessness of the company or its agents, or it may have been accidental. I saw him put his hand on the handle of the car to get up, his hand slipped and he fell, when I immediately reversed the engine and stopped. I have been running for nine years, and have been familiar with the duties of engineer and fireman for eleven years. The distance from where Jackson got off to the point where we had to stop was the length of three cars. It was not necessary for Jackson to get back on the locomotive until it stopped. It is the duty of a fireman to get off the engine at stations and aid in removing cars and obstructions. They frequently get off and on when the cars are moving. I do not consider it safe at any time. It is the duty of the fireman to get off the engine after it starts, to shut the cylinder cock, and get up again when it is in motion. Have never known any fireman to get hurt in getting on the engine before Jackson.

On the part of defendant, James Tuten testified: A higher rate of wages was paid to firemen than to train hands and laborers, because they were employed in more dangerous work. The attaching of a rope from an engine to the train would not be called coupling cars. It is the duty of the fireman or engineer generally to do this. If the fireman is present and directed by the engineer, it is his duty to connect the engine with the cars.

Vinson testified: I was within fifty feet at the time the accident occurred. After the engineer pulled his train up and had stopped the engine, I saw the boy standing looking toward the carpenter's shop. I think he was talking to some one in the shop. When the engineer received word to back his engine, the boy started to get on. When the engine had made a turn. or two I heard him "holler." He was on the opposite side from me. The train was on one track, the engine on the other. There was plenty of time, from the time the rope was loosened

to the time the engine started, to have got on before it started. He was hurt after the engine had stopped and the rope detached. Getting out to attach a rope to the train and engine would not be called " coupling cars."

The testimony being closed, the court charged the jury as requested by the counsel for the respective parties, and no exceptions were taken to the charge. The jury returned a verdict for the plaintiff, and assessed the damages at $1800.

The defendant moved for a new trial on the grounds stated in the assignment of errors.

This motion was overruled, judgment entered, and defendant appealed.

The errors assigned are:

The court erred in overruling the motion for a new trial,

1st. Because the verdict is contrary to evidence.

2d. Because the verdict is contrary to the weight of evidence.

3d. Because the verdict is contrary to law.

4th. Because it is contrary to the instructions of the court.

There have been three trials of this cause—the first in 1861, resulting in a mistrial, the jury having failed to agree upon a verdict; the second in 1866, resulting in a verdict for the plaintiff, upon which a new trial was granted upon the same grounds upon which a new trial is now urged; and the third trial in March, 1868, in which a verdict and judgment was obtained for plaintiff, and upon the refusal to grant a new trial the case now comes before this court.

It is well suggested that where two juries have concurred in a verdict, it must be a strong case to warrant this court in granting a new trial, and it is said by the appellant that this is such a case. In Swinnerton against Marquis of Stafford, 3 Taunton, 231, the court says: "The jury, who are the competent judges, have again had the case before them, and have decided it. Even if, on nicely scrutinizing all the evidence, we had a doubt whether the verdict was right, it could never be right for

512                    SUPREME COURT.

Pensacola and Georgia Railroad Co. vs. Miles Nash—Opinion of Court.

as to make no weight of two verdicts of a jury, in order to take the chance of a third." Each of the judges expressed themselves in similar language, and some of them say they would have been better satisfied if the verdict had been the other way. It seems, by the report of the case, as well as by the comments of the judges, that there was conflicting testimony before the jury, and the motion for a third trial was upon the ground that the verdict was against the weight of evidence. The case of Barrett vs. Rogers, 7 Mass., 297, cited by the appellee, was one in which the motion was made for a new trial for the misdirection of the judge in matter of law, and it appears that the testimony on the trial was contradictory. The court says: "The ground of the result to which the jury came may not be very intelligible, but as two juries have concurred in it, we think on that account the verdict ought not to be disturbed, and more especially as no objection is made to it as being against evidence." In Frost vs. Brown, 2 Bay., 133, a third trial was moved for, on the grounds that the finding of the jury was contrary to the limitation acts and the *rules* of evidence. The court was divided upon the question. Each party claimed title to lands in question, and the testimony left a doubt as to the locality of the land described in the defendant's deeds, and also doubt as to the existence of a deed necessary to the plaintiff's title. The judges who opposed the granting of a new trial, did so upon their view of the law and the quality of the evidence, and add, that they will not disturb the verdict for another reason, viz.: "A second trial has already been had, and two special juries have concurred in finding the same facts; I think we have no authority to interfere any further. For although I would never surrender a plain and certain rule of law to the caprice of a jury, or any number of juries, yet where the law is complicated with facts, so that the construction and application of it must depend on the finding of facts, two concurrent verdicts, even against the opinion of the judges, ought to be conclusive."

Where the evidence is contradictory, making it the duty of a

jury to decide upon the credibility of the witness, the court will not set aside a verdict as against the weight of evidence, although it seems to preponderate against the finding of the jury. Talla. R. R. Co. vs. Macon, 8 Fla., 299; 2 Wend., 352; 3 Hill, 250; 2 Hill, 576. A new trial will be granted where the verdict was contrary to the evidence. Hart vs. Hosack, 1 Cai. R., 25. And where there is evidence on both sides, if it appear that injustice has been done. Leroy vs. Sternburg, 1 Cai., 162. Where a jury on a second trial find a verdict against the decision of the court on the former motion for a new trial on a point of law, the court will grant a rule for a third trial. Silva vs. Low, 1 Johns. Cas., 336.

In Sanderson vs. Hagan, 7 Fla. 318, the court say it will very reluctantly interfere with the verdict of a jury as to the facts, yet where it is unsupported by the testimony in the case, or contrary to it, its duty is imperative to set it aside and grant a new trial.

If, in the case at bar, it appears that the verdict was founded upon a consideration of conflicting testimony as to the material facts, we cannot disturb it, even though we might have come to a different conclusion. If it was found upon testimony which did not tend to prove a material fact, necessary to entitle the plaintiff to recover, and upon an entire misapplication of the facts, or an entire misapprehension of the charge of the court, such charge being unexceptionable, we must in such case order a new trial, even though the same error may have been committed by two or more juries upon the same state of facts.

The testimony is not conflicting as to any material fact. It shows that the slave Jackson was hired by defendant to labor in the capacity of a fireman on the railroad, and to attend strictly to the duties of a fireman, expressly providing that he should not be employed in the work of coupling and uncoupling of cars, nor to attend to any work like shifting cars, " particularly things of that character," because of the dangers attending that kind of employment; and it was to avoid such danger that the

condition was made. The man had been for some time previously employed as fireman and about railroad trains upon this road. Upon the arrival of a train at the end of the road, Jackson was ordered by the engineer to attach a rope to the "tender," (the other end of the rope being attached to the train upon a side track by another person,) for the purpose of moving the train a short distance. That being done, Jackson unloosed the rope from the tender, said "All right, come back," and as the locomotive was starting on slowly, he hurriedly undertook to get back on the engine, his hand failed to seize the "handle" securely, and he fell, the wheel passing over and crushing his foot, and this injury occasioned his death.

Edwads on Bailments, 320, says : "The hirer of chattels for use must use ordinary diligence in taking care of them. * * Where the action is against the hirer for an injury alleged to have been sustained through his negligence, the *onus probandi* is upon the bailor to show that the injury occurred through the defendant's neglect. * * The degree of care demanded by the law is measured always by that diligence which, under the circumstances, a man of ordinary prudence and discretion would exercise in reference to the particular thing, were it his own. * * Where the plaintiff sets forth a special contract of hiring, as that a slave hired should not be employed in and about the water, he must not only show an employment of the slave in and about the water, but that in such employment the injury or destruction of the slave took place. He must support his allegations by proof of the facts alleged. (Humph., 199.) Where a slave is hired for a specific purpose, the bailee is responsible for all damages arising from his employment in a different service, and for any loss occurring while the slave is so employed, though by inevitable accident. Evidence that the loss or injury occurred in a service different from that for which he was hired, is sufficient to sustain the action, without showing any want of diligence on the part of the bailee."

In determining the question of the liability of the appellant

upon the law and the facts, the following inquiries are suggested by the argument and brief of the appellee, viz. : " 1. Whether the death of the slave Jackson was occasioned by the carelessness, negligence, or improper conduct of the appellant; 2. Whether Jackson was killed while in the performance of a duty ordered by the appellant; outside of his regular employment— a duty which he was not required to perform by the contract of hire."

What evidence had the jury that the conduct of the appellant was careless, negligent, or improper, on account of which the man lost his life ?

The circumstances must be considered with reference to the occupation and the nature of the employment in which Jackson was engaged.   He was hired by his master to labor in an occupation which is at all times attended with danger, and there was exacted a higher rate of wages on account of this danger.   The appellee's witness, Bowman, says that he regards it as part of the duty of a fireman to shut the cylinder cocks while the engine is going slowly, and to get upon the engine after it is started; but that the getting off and on the car or engine for the purpose of attaching them together by rope or otherwise, and cutting them loose, was entirely foreign to the work for which Jackson was employed.

Witness Nash says : " I can't say he was to be confined to the engine ; he was hired strictly to perform the duties of a fireman as understood between Bowman and myself—he was not to be sent to couple and uncouple cars."

Now the evidence is that Jackson was ordered to attach the end of a rope to the " tender."   If the injury had occurred " in such employment," and on account of the danger attending it, according to the doctrine in Edwards on Bailments, and the cases cited by him, which seem quite in point, there would be no question that the jury may have been warranted in finding this verdict.   But there is no such evidence whatever.   The work had been done and the man was unharmed.   After it was done he

stood a short time looking toward the carpenter's shop; he himself gave the word "back" the engine, and as it started slowly, undertook to get upon the engine, and by not getting a firm hold of the handle his hand slipped and he fell, the engineer not seeing him until he was making the attempt to get on the engine. It then does not seem that there was "carelessness, negligence, or improper conduct" on the part of the appellant which occasioned the injury, but rather an accident which was, so far as the proof goes, entirely owing to the carelessness of Jackson himself. He was not even ordered to get on the engine; it is proved that it was not necessary, for the engine had arrived at the end of its route. The dangers against which the contract provided were not present at the time, and were no more connected with the accident than if a day had intervened. Nor was there any more danger in his getting upon the engine on that occasion than there was in getting on after turning the cocks, a thing which all the witnesses on the subject agree was strictly within the duties of a fireman.

In the case of the Talla. R. R. Co. vs. Macon, 3 Fla., the court say, quoting the views of "intelligent courts:" "The general principle is well established, that where an injury arises from the misconduct of another, the party who is injured has a right to recover from the injuring party for all the consequences of that injury ; and that " the wrongful act of the bailee renders him liable for all its *natural* and *immediate consequences.*" In Forsyth and Simpson vs. Perry, 5 Fla., 337, a slave was drowned, in attempting to jump on board a steamboat from another boat in obedience to the orders of the mate, the slave being a hand on the steamer, and the jury found that there was " gross negligence." The only important question in that case was, whether the mate or his employer was liable. The court, however, in Kelly vs. Wallace, 6 Fla., 690, commenting upon the case of Forsyth and Simpson vs. Perry, say : " It is difficult to conclude (in the absence of a full statement of the circumstances) that in the mere giving of such an order there was gross negli-

gence." And commenting upon other cases, the court says, "they decide that when a boy is hired for a special purpose he undertakes the hazards of the employment; so does an engineer of a steamboat or a hand at a saw. If either of them, without any order or misconduct of his superior, gets entangled in the machinery so as to lose his life, the loss may not fall on the person hiring."

We thus see that in a case of this character, where the servant is hired to service in an employment in itself more or less dangerous, requiring much care on the part of the servant, and where without the exercise of caution and intelligence by him the danger is constant, and where on account of the peculiar character of the employment, a price is exacted beyond the wages of ordinary labor, the extra risk being taken into account, the loss occurring on account of the carelessness or heedlessness of the servant, and without the fault of the hirer, the hirer is not liable. We conceive that this is such a case; that the slave Jackson was not injured in the act of performing an improper order, or while employed in an act not warranted by the contract of hiring; that if he *had* lately *been* so engaged, the injury did not occur in its performance nor in consequence thereof.

In our judgment, therefore, the verdict of the jury was contrary to law and to the evidence, and the judgment must be reversed and a new trial awarded.